**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X
In the Matter of:

AIRPORT CENTER DEVELOPMENT
CO., INC.,                                              Chapter 11
                                                        Case No. 05-60184 (KCF)
                                                        Adversary No. 05-06269

     Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - -X
EMERY FISHER AND RITA FISHER,
     Plaintiffs

        vs.

AIRPORT CENTER DEVELOPMENT
CO., INC.
     Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**

W. Peter Ragan, Esq.
Ragan & Ragan, P.C.
3100 Route 138 West
Brinley Plaza, Building One
Wall, New Jersey 07719
Attorney for Plaintiffs

Richard P. Coe, Jr., Esq.
Weir & Partners, LLP
210 Haddon Avenue
Westmont, New Jersey 08108
Attorney for Defendant/Debtor

**THE HONORABLE KATHRYN C. FERGUSON, U.S.B.J.**

**DISCUSSION**:

**Factual Background**

The Debtor, Airport Center Development Co., Inc. ("Debtor"), is the owner of a parcel of undeveloped land commonly known as Lot 1-C0018, Block 920, West Hurley Pond Road, Wall Township, New Jersey, which consists of approximately 2.505 acres (the "Property"). Lynn Stuart ("Stuart") is the President of the Debtor corporation as well as the 100% shareholder. On November 5, 1990, the Debtor and Stuart executed and delivered a Mortgage ("Mortgage") to Multi-Mortgage Services, Inc. ("Multi-Mortgage"), which encumbered the Debtor's property. J-1. Also on November 5, 1990, the Debtor and Stuart executed and delivered to Multi-Mortgage a Mortgage Note ("Note") in the principal amount of $35,000.00, secured by the Mortgage. J-2. That same day, said mortgage was assigned by Multi-Mortgage to Dr. Marvin J. Nicholas Trustee, Dr. Marvin J. Nicholas Pension Fund, Emery J. Fisher III and Rita A. Fisher ("Fishers" or "Plaintiffs"), and First Trust Corp., Trustee FBO Edward E. Mardini, MD IRA Account #: 1384180-0001. J-8, J-9. The Fishers obtained a 51.4286% interest in the Mortgage and the Mortgage Note. The remaining 48.5714% interest in the loan was obtained by Dr. Marvin J. Nicholas Trustee, Dr. Marvin J. Nicholas Pension Fund, and First Trust Corp., Trustee FBO Edward E. Mardini, MD IRA Account #: 1384180-0001. A Mortgage Purchase and Servicing Agreement was also executed and delivered between William Parkins, on behalf of Multi-Mortgage, and the Fishers. J-7.

During the term of the mortgage (one year), the Debtor paid the required sums. However, when the balloon payment became due in early November 1991, the Debtor failed to make payment. On December 9, 1991, William Parkins sent a letter to Samuel Busada, another servicing agent, stating that Mr. Parkins would no longer service the Debtor's account and that he would forward to Mr. Busada a complete printout of all payments received on the Debtor's account so that Mr. Busada

can take whatever action deemed necessary to collect the balance. J-14.

On March 20, 2003, a contract for the sale of the Property at issue was drawn up and signed by the potential purchaser, Gustave Dylla. J-22. On or about April 14, 2003, Mr. Busada sent to the Fishers an offer to discharge their portion of the Mortgage for $49,028.57, which was to consist of the $18,000 principal plus $31,028.57 of accrued interest. J-25. On April 17, 2003, the Fishers' attorney sent a letter to Mr. Busada rejecting that proposal and alleging that Mr. Busada used in his calculations an improper interest rate of 18%. J-27. The Fishers also did not execute a discharge of mortgage. The sale of the Property was not consummated.

On November 1, 2005, the Debtor filed a voluntary petition for relief under Chapter 11. On December 8, 2005, the Fishers initiated this adversary proceeding against the Debtor. The Fishers contend that the Defendant/Debtor has defaulted in the terms and conditions of the Note and Mortgage and that there is presently due thereon the sum of $18,000 (representing the Fishers' 51.4286% interest) plus accrued interest at a rate of 18% per annum during the first year of the Note and thereafter, upon default, at the rate of 29.679%, less payments made on account, if any. The Fishers also maintain that the rate of interest of 29.679% upon default is to be compounded annually.

In response, the Debtor asserts that Mr. Busada, as servicer-assignee of the Debtor' account, made oral representations to the Debtor that the rate of interest upon default with respect to the Note and Mortgage at issue would not be compounded at 29.679%, but rather calculated at a simple rate of 18%. The Debtor also argues that it has valid claims against the Plaintiffs for (1) damages under New Jersey's Consumer Fraud Act, (2) tortious interference with contract, and (3) for breach of the covenant of good faith and fair dealing due to the Plaintiffs failure to accept the Debtor's offer to discharge the Mortgage for a sum certain, which Debtor argues caused the sale of the Property to fall through.

**Interest rate upon default of the Note and Mortgage**

"The pertinent principles of contractual construction are straightforward. The court makes the determination whether a contractual term is clear or ambiguous." Schor v. FMS Financial Corporation, 357 N.J. Super. 185, 191 (App. Div. 2002) (*citing* Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997) (*quoting* Kaufman v. Provident Life and Cas. Ins. Co., 828 F. Supp. 275, 282 (D.N.J. 1992)). An ambiguity exists if the "terms of the contract are susceptible to at least two reasonable alternative interpretations." Schor, 357 N.J. Super. at 191. As a general rule, the "terms of the contract must be given their plain and ordinary meaning." Id. (*quoting* Kaufman, 828 F. Supp. at 283) (internal quotations omitted). Accordingly, "where the terms of the contract are clear and unambiguous there is no room for interpretation and construction and the courts must enforce those terms as written." Id. (*quoting* Karl's Sales and Service, Inc. v. Gimbel Bros., Inc., 249 N.J. Super. 487, 493 (App. Div. 1991)) (internal citations omitted). The court will not rewrite a clearly written contract or "remake a better contract for the parties than they themselves have seen fit to enter into, or to alter it for the benefit of one party and to the detriment of the other." Id. at 192. (*citing* James v. Federal Ins. Co., 5 N.J. 21, 24 (1950)).

The Mortgage at issue in the instant case incorporates the language contained in the Note, which provides:

> In return for a loan that I [Debtor/Stuart] received, I promise to pay $35,000.00 (called "principal"), plus interest to the order of the Lender [Multi-Mortgage]. Interest, at a yearly rate of 18.0% will be charged on that part of the principal which has not been paid from the date of this Note until all principal has been paid. If I do not pay in accordance with the Note and Mortgage, the interest after maturity will be computed on a daily basis at the annual percentage rate of 29.679%.

*See* J1, J2, and J-3. Because it is undisputed that the Debtor failed to make its balloon payment in accordance with the terms of the Note and Mortgage, the Debtor is in default. Thus, the issue that this Court must now address is what rate of interest should apply and how that rate should be

calculated.

At the outset, it is undisputed that the rate of interest until maturity is 18% under the terms of the Note. What is in dispute, however, is which rate should be applied upon default. While the Plaintiffs argue that the terms of the Note should apply, the Debtor asserts that it lawfully relied on oral representations made by Mr. Busada that the interest rate upon default would remain at 18%. Due to the clear language of the Note, however, the Debtor's argument must fail. The unambiguous terms of the Note provide:

> No Oral Changes: This Mortgage [or Note] can only be changed by an agreement in writing signed by both the Borrower(s) and the Lender.

*See* J-1, J-2. In light of this clear and unambiguous language, and the fact that there is no writing providing for a change in the interest rate upon default, the default rate of 29.679% applies. Any reliance by the Debtor on oral statements made by Mr. Busada would be unreasonable as those statements conflict with the precise language of the Note.

### **Compounding of Interest**

With respect to the interest to be applied upon default, the Plaintiffs contend that not only should the interest rate of 29.679% apply, but that said interest should be computed on a compounded basis. Despite this contention, however, the contemplation of compound interest is found neither in the Mortgage, the Note, the Servicing Agreement, nor the Assignment of Mortgage to the Plaintiffs. In fact, the Note is the only document that addresses the interest rate upon maturity. That section of the Note states:

> If I [Debtor/Stuart] do not pay in accordance with the Note and Mortgage, the interest after

maturity will be computed on a daily basis at the annual percentage rate of 29.679%.

*See* J-2. Thus, given the fact that the Note clearly provides for an annual percentage rate computed on a <u>daily basis</u>, and that "compound interest" is not mentioned in any of the relevant documents, the Plaintiffs lose on their compounding theory.

Even if the relevant documents explicitly stated that default interest was to be compounded, the Plaintiffs' argument would still fail. In <u>Henderson v. Camden County Mun. Util. Auth.</u>, 176 N.J. 554, 560-561 (App. Div. 2003), the New Jersey Appellate Division noted that:

> [b]ecause compound interest 'unduly hastens the accumulation of debt,' courts regard it as unfairly 'harsh and oppressive.'" <u>Abramowitz v. Washington Cemetery Ass'n</u>, 139 N.J. Eq. 293, 296, 51 A.2d 461 (Ch. 1947). Accordingly, compound interest is disfavored at common law. *See* <u>Shadow Lawn Sav. & Loan Ass'n v. Palmarozza</u>, 1990 N.J. Super. 314, 317, 463 A.2d 384 (App. Div. 1983).

In <u>Shadow Lawn Sav. & Loan Asso. v. Palmarozza</u>, 190 N.J. Super. 314 (App. Div. 1983), cited by <u>Henderson</u>, appellant second mortgagee (Palmarozza) purchased a piece of property after default upon which both appellant and appellee mortgagee (Shadow Lawn) in possession held mortgages. Among other claims, appellant contended that appellee illegally charged compound interest on the Property after default. <u>Id.</u> Appellee argued that it was allowed to charge compound interest as authorized under New Jersey's then Savings and Loan Act. <u>Id.</u> On review, the court found that appellee was not permitted to charge compound interest after default absent an agreement between the parties. <u>Id.</u> Specifically, the court held:

> The parties could have contracted for compound interest expressly or by clear and unambiguous incorporation of the statutory provision. [citations omitted]. We do not hold that all remedies afforded by law in case of default need be set forth in the mortgage or the note or bond secured by the mortgage. However, if a different effective rate of interest is to apply after default, in our view this is a term and condition that should be negotiated by the parties and expressly set forth as part of their agreement. Because it had not done so, Shadow Lawn is precluded from charging compound interest.

<u>Shadow Lawn</u> 190 N.J. Super. at 317.

Although Shadow Lawn is distinguishable from this case in that the Debtor and Multi-Mortgage did in fact contemplate a default rate of interest, the New Jersey Appellate Division's rationale that certain terms and conditions negotiated by parties to a note and mortgage should be expressly set forth as part of their agreement holds true. Whereas the Debtor and Multi-Mortgage expressly agreed that there would be a 29.679% default interest rate on the Note and Mortgage, the parties did not expressly set forth that said rate should be compounded. Rather, the Note merely states that the default interest will be computed on a daily basis. Absent such a condition, therefore, the Plaintiffs should not be awarded compounded interest on the default rate.

## The New Jersey Consumer Fraud Act

"The New Jersey Consumer Fraud Act ["CFA"], N.J.S.A. 56:8-1 to -20, authorizes a private cause of action when a plaintiff has suffered an 'ascertainable loss of moneys or property, real or personal,' as a result of a practice in violation of the CFA." Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 238 (2005) (*citing* N.J.S.A. 56:8-19). "The Consumer Fraud Act is aimed at promoting truth and fair dealing in the market place." Feinberg v. Red Bank Volvo, Inc., 331 N.J. Super. 506, 512 (App. Div. 2000). The three main purposes of the Consumer Fraud Act are (1) to punish the wrongdoer through the award of treble damages, (2) by way of the counsel fee provision, to attract competent counsel to counteract the community scourge of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual, and (3) to compensate victims for actual losses. Wanetick v. Gateway Mitsubishi, 163 N.J. 484, 490 (2000).

The seminal New Jersey case interpreting the CFA is Cox v. Sears Roebuck, 138 N.J. 2 (1994). Cox affirmed that treble damages, attorneys fees, and costs are all available to a successful plaintiff under the CFA. Id. In full, N.J.S.A. 56:8-19 holds that:

> Any person [emphasis added] who suffers any ascertainable loss of moneys or property, [emphasis added] real or personal, as a result [emphasis added] of the use or employment by another person of any method, act, or practice declared

> <u>unlawful</u> [emphasis added] under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, including those brought by the Attorney General, the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit. (emphasis supplied).

*See* <u>N.J.S.A.</u> 56:8-19.

In this case, the Debtor has asserted a CFA counterclaim against the Plaintiffs. Although the Debtor is a corporate entity, the CFA defines a "person" as "any natural person or his legal representative, partnership, <u>corporation</u>, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, members, stockholder, associate, trustee or cestuis quetrustent thereof.." *See* <u>N.J.S.A.</u> 56:8-1(d). Therefore, the Debtor corporation may seek protection under the CFA.

Furthermore, the CFA is applicable to the Note and Mortgage at issue. As the New Jersey Supreme Court explained in <u>Lemelledo v. Benefit Mgmt. Corp.</u>, 150 N.J. 255, 265 (1997):

> By its terms, the CFA is applicable to the provision of credit. It specifically includes loans in its definition of what constitutes an 'advertisement.' <u>N.J.S.A.</u> 56:8-1(a). Moreover, its definition of 'merchandise' as 'anything offered, directly or indirectly to the public for sale' is more than sufficiently broad to include the sale of credit. *See* <u>Tuxedo Beach Club v. City Federal Savings Bank</u>, 749 F. Supp. 635, 649 n.13 (D.N.J. 1990). Given the broad language of the CFA, we conclude that its terms apply to the offering, sale, or provision of consumer credit.

Thus, under <u>Lemelledo</u>, because the Note and Mortgage at issue is a provision of consumer credit that was extended by Multi-Mortgage to the Debtor, the Debtor may proceed with its counterclaim. However, to succeed on a CFA claim, the Debtor must also demonstrate that the Plaintiffs have violated some method, act, or practice, and, as a result, the Debtor suffered an ascertainable loss.

In its counterclaim, the Debtor argues that the Plaintiffs have committed "unlawful practices" under <u>N.J.S.A.</u> 56:8-19 by violating <u>N.J.S.A.</u> 56:8-2. Section 56:8-2 states:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice...

Thus, in order to establish a violation of N.J.S.A. 56:8-2, the Debtor must demonstrate some type of fraud, misrepresentation, omission, concealment, or the like, on behalf of the Fishers. Here, the Debtor asserts that the Plaintiffs have violated N.J.S.A. 56:8-2 by:

1. Inaccurately calculating the amount of interest due and owing by the Debtor, thereby incorrectly stating an amount in excess of the amount due;

2. Incorrectly assessing interest at a rate of 29.[679]% notwithstanding the modification of the interest rate to 18% by the Fishers' agent;

3. Compounding interest upon interest, notwithstanding that the Loan provides for a calculation of simple interest;

4. Calculating interest on a 360 day calendar rather than on a 365 day calculation of interest;

5. Assessing "late charges" notwithstanding the waiver of all late fees and charges by the Fishers' agent';

6. Assessing an interest balance for the first year of the Loan notwithstanding the pre-payment of interest at time of closing of the Loan, and the timely payment of the remainder of the first year's interest by the Debtor to the Servicing Agent;

7. Seeking reimbursement for property searches and/or for legal fees, when the Note and Mortgage do not provide for such reimbursement;

8. Failing to account for setoffs including, but not limited to, a payment by Stuart (on behalf of the Debtors) to Busada in the amount of $6,186.43 on account of the 3% servicing charge owed to Busada by the Fishers;

9. Refusing to accept the good faith tender of full payment of principal and accrued interest by the Debtor to Busada, in his capacity as agent for the Fishers, of all amounts due and owing to the Fishers in or about April 2003, following receipt of the payoff amount from Busada; and

10. Deliberately demanding at various times, and in bad faith, payments of $200,000 and $591,769.64 in order to discharge the Mortgage.

*See* Debtor's Closing Argument Brief, pp.25-26. Despite the Debtor's contention that the Plaintiffs have violated N.J.S.A. 56:8-2, however, the specific allegations outlined above do not carry any

badges of fraud, misrepresentation, omission, concealment, or the like. Rather, the Debtor's allegations reflect the actions taken by the Plaintiffs to collect what they believed they were legally entitled to based on the Note and Mortgage. None of those actions indicate that the Plaintiffs have violated N.J.S.A. 56:8-2.

Even if this Court were to hold that the Plaintiffs did in fact violate a provision of the CFA, the Debtor cannot establish an "ascertainable loss" as damages are too speculative. The Consumer Fraud Act makes a claim of ascertainable loss a prerequisite for a private cause of action. Weinberg v. Sprint Corp., 173 N.J. 233, 251 (2002). Clearly, a causal relationship must exist between the ascertainable loss and the unlawful practice in order to be entitled to damages under the Consumer Fraud Act. Feinberg v. Red Bank Volvo, Inc., 331 N.J. Super. 506, 511 (App. Div. 2000). "Even though a plaintiff need not actually expend a sum of money as a result of defendant's unlawful consumer practice in order to demonstrate a loss, the amount of the loss must be ascertainable and must be established with reasonable certainty." Dabush v. Mercedes-Benz USA, LLC, 378 N.J. Super. 105, 116 (App. Div. 2005) (*citing* Cox, *supra*, 138 N.J. 2 at 22).

The Debtor alleges that as a direct and proximate result of the Fishers' consumer fraud under the CFA, it has suffered damages in the amount of $231,368.30, including the loss of the sale of the Property and additional carrying costs for the Property. The Debtor bases its alleged damages on a contract for sale of the Property. D-23. However, based on the evidence before this Court, the potential sale was too speculative to demonstrate an ascertainable loss under the CFA. At trial, no testimony was proffered from the purported buyer on any ability to close on the sale. Nor was there any evidence offered to show that the deposit referred to in the contract was ever tendered. Finally, neither the Debtor corporation itself nor its President, Stuart, signed the contract at issue. Therefore, this Court finds that the Debtor has not demonstrated an ascertainable loss under the Consumer

Case 05-06269-KCF    Doc 46    Filed 01/18/07    Entered 01/18/07 13:16:00    Desc Main
                        Document         Page 11 of 13


Fraud Act.

## Tortious Interference with Contract

As the New Jersey Appellate Division noted in Singer v. Beach Trading Co., 379 N.J. Super. 63, 81 (App. Div. 2005), the elements that must be established to sustain a claim for tortious interference with a contract and/or prospective business relationship include the following:

1. The plaintiff had some reasonable expectation of economic advantage;
2. The defendant's actions were malicious in the sense that the harm was inflicted intentionally and without justification or excuse;
3. The interference caused the loss of the prospective gain or there was a reasonable probability that the plaintiff would have obtained the anticipated economic benefit; and
4. The injury caused the plaintiff damage.

For the same reasons that the Debtor's CFA claim cannot be sustained, Debtor's claim for tortious interference with contract also fails. Even if the Debtor could establish that the Fishers acted in a malicious manner when they attempted to satisfy and discharge their interest in the Note and Mortgage, they cannot establish elements 1, 3, and 4 on their claim for tortious interference with contract. As with the Debtor's CFA claim, the lack of testimony from the potential buyer that there was any ability to close on the sale seriously undermines the Debtor's reasonable expectation of economic advantage. If in fact testimony from the potential buyer demonstrated that there was no ability to close, then that reason alone may have caused the contract to fall through. The contract was simply too speculative.

## Breach of Fair Dealing

"Every party to a contract...is bound by a duty of good faith and fair dealing in both the

performance and enforcement of the contract." Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr.Assocs., 182 N.J. 210, 224 (2005). "The covenant of good faith and fair dealing calls for parties to a contract to refrain from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive' the benefits of the contract." Id. at 224-225 (*citing* Wilson v. Amerada Hess Corp., 168 N.J. 236, 245 (2001)) (*quoting* Restatement (Second) of Contracts, Section 205, Comment a).

As to the elements of a claim for breach of the covenant of good faith and fair dealing, the New Jersey Supreme Court noted:

> Proof of 'bad motive or intention' is vital to an action for breach of the covenant. [citations omitted]. The party claiming breach of the covenant of good faith and fair dealing 'must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.' [citations omitted].

Brunswick Hills, 182 N.J. 210 at 225.

In this case, the Debtor's claims for breach of good faith and fair dealing directly correspond to their CFA claim in that the Debtor is alleging the same types of violations. *See* p. 9, *infra.* In order to successfully prove a claim for breach of good faith and fair dealing, the analysis is similar to a claim under the CFA or for tortious interference with contract in that there must be some causal relationship between one parties' conduct and the other parties' detriment. As previously discussed, there is no such showing here. Rather, the contract to sell the Property at issue is too speculative to

hold the Fishers liable for breach of the Note and Mortgage agreement.

## Conclusion

The mortgage that the Debtor gave to Multi-Mortgage Service, Inc. clearly states that the default rate of interest will be 29.679 % alterable only by written agreement. Since the Debtor did not produce such a written agreement, the interest rate in the documents signed by all the parties stands. Since the parties did not have a written or even an oral agreement as to whether that rate would be compounded, however, the interest will accrue on an annualized basis. Debtor's counsel shall submit a form of judgment fixing the amount of the Plaintiff's claim based on these principles.

The same judgment should dismiss the Debtor's New Jersey Consumer Fraud Act and Tortious Interference with Contract Claims, as they are not supported by the record.



_____/s/_____
Hon. Kathryn C. Ferguson, USBJ

Dated: January 18, 20007

.